Bernice Levy, Plaintiff-Appellant, v. Harvey
Burton Levy, Defendant-Appellee.

**Gen. No. 53,510.**

First District, Fourth Division.

December 3, 1969.

Harold A. Liebenson and Milroy R. Blowitz, of Chicago (Harold A. Liebenson and Milroy R. Blowitz, of counsel), for appellant.

Alfred M. Walter, of Chicago, for appellee.

MR. JUSTICE STAMOS delivered the opinion of the court.

In a post-divorce decree proceeding the trial court ordered that the custody of the 12-year-old son of the parties be changed from plaintiff to defendant. Plaintiff, who is the mother, appeals from that order. Plaintiff argues:

(1) that the evidence did not establish a substantial change of circumstances affecting the welfare of the child to justify changing custody to defendant;

(2) that neither defendant's remarriage nor the child's preferences were sufficient to cause a change of custody;

(3) that the court erred in the admission of certain evidence and

(4) that defendant failed to sustain his burden of of proof.

The parties were married on April 5, 1951, and their son was born on September 4, 1955. On March 8, 1966, the parties were divorced and the decree granted plaintiff custody of their son. Prior to the parties' divorce, their son demonstrated severe emotional behavioral prob-

lems. Plaintiff went to live in Camden, New Jersey, and was granted leave to have her son live there with her. The court provided defendant have the right to visit and telephone his son and that the son visit defendant in Chicago during the summer months and vacation periods.

In the summer of 1968, the son visited defendant pursuant to the provisions of the decree of divorce, but the son did not return to plaintiff's custody.

Plaintiff then filed a petition demanding the return of the child and for a modification of the decree to provide that the child remain in school for the summer. Defendant filed an answer and a counterpetition to modify decretal provisions relative to custody by now awarding custody of their child to defendant.

EVIDENCE

BERNICE LEVY, plaintiff, testified:

She is a resident of Camden, New Jersey, and prior to the divorce the child lived with her, and was attending a school for emotionally disturbed children at the time the decree of divorce was entered. The child had been treated as a weekly outpatient at the Community Child Guidance Clinic of Camden, New Jersey for about 1½ years before the divorce of the parties. Upon recommendation of the Clinic the child was enrolled in the Southern Home for Children, because he did not respond to plaintiff. The child was disobedient, started fires, hurt animals and destroyed his own and others' property.

Plaintiff visited the child twice a week. He would come home for Sundays and spend every other weekend with plaintiff at home.

In the spring the child returned from Chicago where he had been visiting defendant and plaintiff testified that the child seemed very despondent and unhappy telling plaintiff "Dad is going to have another baby" and

"Oh, my father can keep his babies." Plaintiff further testified the child was upset over the fact that defendant was married and had a family and that he was not the only child anymore. She believed that this contributed to the child receiving low grades in school.

When the child is home from school plaintiff is always with him. After the divorce plaintiff purchased her own home and the child had his own room, and has a dog and a cat as pets.

At the present time plaintiff has no major problems with the child, but the child is unhappy, torn between plaintiff and defendant. He hates his school, but the Clinic people advised her that once the child commences to like the place then the child must be institutionalized. The school advised plaintiff that if the child does not return he will lose his place, because the school has a long waiting list.

On cross-examination plaintiff testified:

She is a waitress supplementing her income doing a musical novelty act which requires some travelling. The nightclub acts are on weekends and not more than 60 or 100 miles from home, allowing her to return. When she has club dates on weekends, when the child is home, plaintiff engages the services of a babysitter who has known the child since he was 5 years old. The babysitter handles the child fairly well.

The child is now obedient enough and regardless of any of the normal routines, he is able to accept them and the child has improved.

The child has indicated he would prefer to live with defendant and told the plaintiff that he would live with her if she would remove him from the school. The preference for defendant is based upon the fact the child has a good time when staying with the defendant because he is not living the day-by-day life he was in New Jersey but is in Chicago for a good time. She further testi-

fied that the defendant has always been a "good time Charley."

She never indicated a desire to be separated from her son and resisted placing the child into the Home, succumbing only because she was advised that it would be difficult to treat the child as an outpatient. The child has been enrolled at the Southern Home for Children for the past two years and is responding. Twice a week she has individual conversations with the caseworker. She stated that the child is aggravated with her because she keeps him at the Home and he is afraid of the fact that they might hit upon the truth.

Defendant has written letters to the school, but has never called them. He has visited the child at school and constantly receives reports regarding him.

JACOB H. MALTZ, called as a witness on behalf of plaintiff, testified:

He is a psychiatrist, licensed in the State of Illinois, and has been practicing for 20 years. He is board certified in psychiatry for 12 years, an examiner for the psychiatric creditation board and was Superintendent of the Chicago State Hospital. Pursuant to his duties at Chicago State he had any number of emotionally disturbed children under his care. At the present time he is Medical Director of Ridgeway Hospital, which is a private psychiatric facility which deals primarily with emotionally disturbed children, adolescents and emotionally disturbed adults. He had overall responsibility for the supervision and direction of the treatment program.

He saw plaintiff in his office and discussed the status of the parties' child with her. The witness telephoned the Southern Home for Children and talked to the child's psychiatric social worker. Plaintiff's Exhibit No. 1, a letter from the psychiatric social worker at Southern Home, which plaintiff delivered to the witness was admitted into evidence over defendant's objection.

The witness also produced a letter he received from the psychiatrist who was attending the child at the Southern Home for Children. This was admitted into evidence as plaintiff's Exhibit No. 2 over defendant's objection.

The witness then testified that based upon his conversation with the psychiatric social worker, plaintiff, and plaintiff's Exhibits Nos. 1 and 2, he formed an opinion as to the child's condition and what should be done for his future to help him. It was his opinion that the child has been making satisfactory progress at the Southern Home and is being handled on a daily basis with individual psychotherapy and that the prognosis is favorable if the child is permitted to continue in this setting. This witness has never talked to the child.

Over defendant's objection, Plaintiff's Exhibit No. 3, a progress report from the Philadelphia Public elementary school system, was admitted into evidence.

The witness testified that the child's grades for the first semester were excellent and good for most part, but after his visit to Chicago the grades declined and there were many unsatisfactory grades. The witness expressed another opinion that from glancing at the reports and the school records it was his opinion that the child should remain with plaintiff and in the Southern Home for Children.

On cross-examination, Dr. Maltz testified as follows:

His opinion is based upon the exhibits, conversations with plaintiff and the psychiatric social worker. Plaintiff's Exhibit No. 1 leads the witness to believe that the child was admitted to the Southern Home with the present symptoms of poor social and academic adjustment in school.

The witness assumed that the grades the child received for the school year ending in 1968 were better than the grades for his first year. The exhibits indicate to the witness that the child is making satis-

factory progress during the period of treatment. The witness then quoted from the exhibits wherein it was stated that the child had made sizable gains in adjusting to his family situation. The exhibits revealed he was receiving milieu therapy, meaning environmental treatment. Such therapy is designed to enable him to function as an individual in an emotionally healthier way. While its goal is to enable him to adjust to the family structure, it does not necessarily enable him to live normally in such a family structure. The witness further related that from his reading of the Exhibit No. 2, the psychiatrist's report, the child's release from the Home is dependent upon his responsiveness to plaintiff's discipline and direction. The exhibit further reflected that the child's response lacked consistency.

DR. JACK ARBIT, called as a witness on behalf of defendant, testified as follows:

He is not an M.D., but a clinical psychologist with a doctorate in psychology and is registered to practice in the State of Illinois. He received his doctorate 13 years ago and has received his Bachelors, Masters and Graduate degrees from the University of Illinois. He had a Post Doctorate Fellowship with the Veterans Administration and taught at the Illinois Institute of Technology and Northwestern University, where he is on the full staff of the University Medical School. As a director of clinical psychology at Northwestern University he has had occasion to examine and evaluate the mental condition of emotionally disturbed children, and sees an average of 3 or 4 a week.

At the request of Dr. Israel Zivin, a psychiatrist and neurologist, the witness examined the child on July 5, 1967. He conducted tests and found that the child functioned intellectually in the average range, though intellectually he was not functioning at the optimal capacity in terms of actual achievements, but was functioning

200

significantly below this. The witness attributed this to the presence of the child's marked anxiety.

He believed the child should be in a situation where the child could have a family with which to interact and identify and that the anxiety was perpetuated by the presence of the effects of being unsettled. The placement of the child in an institutional school program for emotionally disturbed children did not seem to be appropriate.

The witness again saw the child almost a year later on July 17, 1968, two days before the witness testified in these proceedings. He found the child's condition had deteriorated and that he had moved from a youngster functioning in the average range to one functioning in the dull-normal level. Scholastically, while he was one to two years behind, he was now almost three years behind what one would expect on the basis of such abilities as arithmetic.

The witness found the child had suffered an intellectual and emotional regression during the past year. The child was much more depressed, agitated and distraught internally.

It was the opinion of this witness that the child should be in a home where there is a father and mother who can provide what he needs by way of some stability in a family. The child would also need some definite form of outpatient treatment which the witness believed to be better than institutional treatment.

On cross-examination, Dr. Arbit, testified:

He diagnoses and evaluates emotionally disturbed children who are sent to him by psychiatrists, neurologists and orthopedics. If any patient needed some form of somatic or physical treatment like electric shock, pills or insulin, he would refer them to a psychiatrist.

The Psychiatric Clinic of Northwestern University is headed by a psychiatrist. The witness is the Director of the Clinical Psychology Services.

The court inquired, "I do not believe I understood the results of the personality test in 1967," and the witness responded that the child produced a lot of material that is associated with the very intense feelings of anxiety and symptomatic of a very fearful, very agitated, very distraught youngster. There was some evidence of post depressive quality at that time, but this was less marked in the fact that this seemed to be a very anxious youngster. He was not psychotic, not autistic or regressive; he had problems.

In 1968 there was a precise pattern, only much more severe. It was the same pattern of very severe anxiety with marked convictions. He does not determine the individuals involved or motivating or contributing factors.

RALPH LEVY, the child of the parties was called as a witness on behalf of defendant and testified:

He recalled a conversation in chambers with the judge and both counsel. He was not happy in the Southern Home for Children because he lacked a family at the Home. If he is not at the Home he does not want to stay at his mother's home because he has no family there, no sisters like he has at defendant's home. He likes his sisters and denied that he told his mother he was angry because his father remarried.

He had gone out to dinner with his mother a few days before and they had a nice evening, but his mother told him that if he lived in Chicago his mother would never see him again, and he would have to give up his pet dog and trains. The witness said he felt that his mother loved him, but he still desires to live with his father even though the witness will have to take responsibilities and go to a doctor or psychologist for treatment in addition to going to school, but the witness is willing to do this.

On cross-examination the child testified:

While no one told him what to say, he had discussed his testimony with both his mother and father. He had certain responsibilities, among them listening to his parents and watching over his sisters. The food at the Home was not the greatest. He would see his mother once a week and on weekends and every other week he would go home. He does not want to stay there because it's not a family and he lacks a father there. He feels he belongs with his family and sisters. The witness said that he has discussed with his mother the possibility of her marrying again, but she told the witness that she cannot remarry again because of the witness and can only remarry again when the witness is out of the Home. He likes his father's present wife who treats him well, but does not always mind her. She has to yell at him and tell him what to do and not to do.

HARVEY BURTON LEVY, defendant, testified as follows:

He is the father of the child and is presently married to Leslie Levy. They have two young daughters, one 15 months old and the other one month of age. The child has visited and gets along very well with the family. Defendant and his wife can handle the child coming to live with them. The child gets along very well with the two daughters.

After Dr. Arbit's first examination and evaluation of the child the witness was advised that the child needed a permanent family structure, but notwithstanding this, the witness allowed the child to return to the Home because the witness hoped the child would have a marked improvement with the therapy he received at the Home. The witness related that he did not intend to keep the child when he came for a visit, in fact, he had purchased a round trip ticket for him. However, when it came time to return, the child became emotional

and upset and did not want to return. The witness then sought the advice of legal counsel and the services of Dr. Arbit were retained again.

The witness and the child attend religious services together.

The witness is a musician since 1943 and plays in the Red Garter, a nationally franchised chain of banjo band nightclubs.

Introduced into evidence at this time were three letters written by the child to the defendant and his wife.

On cross-examination defendant testified:

He is of the Jewish faith and provided for the child's religious education. The last time he attended a Temple was on Yom Kippur, and celebrated Chanukah with the child participating at their home.

His gross salary is $175 a week, and take home salary is $151. They occupy a two-bedroom apartment. The child shares a bedroom with the 15-month-old daughter and each has his own bed. Arrangements have been made for a major medical policy which covers the child's medical expenses.

On redirect defendant testified:

He is paying the medical bills for the child's therapy.

In response to the court's inquiry at to whether defendant feels he is in a position to offer the child the home he needs at the present time, defendant responded that he is in a great position to offer the child all the intellectual stimulation and emotional security that the child needs. The court inquired of defendant if the child had exhibited any problems for defendant and his wife that they could not cope with. Defendant testified that there had been no problems other than those normally attributable to a 12-year-old boy. The witness agreed with the court's observation that the living arrangements as they are presently are not ideal, but defendant needs more room, which defendant said he is seeking.

The court also inquired as to defendant's opinion as to the wisdom of removing the child from the Home and changing custody from plaintiff to defendant. Defendant answered that he believed the foregoing would be to the best interest of the child and promised the court that the defendant would never disparage plaintiff, but maximize her virtues which are many and minimize her defects in personality which have been a cause or a contributory cause to some of the child's maladjustments. The child will have a good Jewish home.

EVELYN LESLIE LEVY, called as a witness on behalf of defendant, testified as follows:

She is the wife of defendant and the child of the parties has visited their home 5 to 6 times since the witness married defendant. She has had no discipline problems with the child. Prior to her marriage she was employed as a medical secretary and technician. She has found the child to be helpful and very good and has taken him to visit her parents who live at a private lake in Indiana. She comes from a very large family and when she visited them with the child, he has always been well behaved and has not exhibited any emotional disturbances during any visit. She is prepared to offer the child a home and assist defendant in the sacrifice that might be necessary for outpatient treatment, and she has discussed with defendant the deprivation of luxury to accomplish this.

On cross-examination the witness testified:

She is of the Protestant faith and regularly attends church and defendant is a very religious man. The child would be raised in the Jewish faith as are the two children of the witness and defendant. She and defendant are financially able to properly care for the child.

The court proceeded to propound inquiries of the witness and she responded that she found no special problems attendant with having the child live with them.

The witness is aware of the child's problems in the past and how they were manifested, but she related that they are not out of her control and that she never really had a problem with the child. She found him to be good and very responsible and that she has a good rapport with him. If the court permits the child to live with the witness and defendant, she is aware of all the attendant circumstances and can treat the child and afford him the same love, respect, care and affection as she gives her own children. The witness further testified that the child is a boy and wants a lot of love and it's very easy to give.

OPINION

The order appealed from specifically finds:

". . . That, notwithstanding some possible initial improvement in the emotional problems of the said minor child immediately after his placement in the Home he has shown a marked regression during the past twelve months, and it is for the best interests and welfare of said child that he be removed from the said Home and provided with an environment where he can associate and identify himself with a stable family structure, establish permanent family roots, and receive outpatient treatment, if necessary. . . ."

The parties are in agreement that subsequent to a divorce decree, custody of a child of the parties is subject to the order of the court and may be changed from time to time as the child's best interest and welfare demand. Nye v. Nye, 411 Ill 408, 105 NE2d 300 (1952).

206

Plaintiff argues that there is no substantial change of circumstances, and contends that "the circumstances are the same as when the divorce decree was entered"; that is, that the child was in need of medical treatment then and still requires therapy.

The trial court was confronted with the issue of whether the child's progress at the Home showed promise or whether the promise was lacking and an actual regression was taking place. If the court determined that a regression had occurred the issue then became whether a change in custody would be in the best interests of the child.

■ We find that defendant sustained his burden of proof and that the trial court properly exercised its discretion in making a determination that the child would be afforded more promise to regain his health if custody were changed to defendant who could afford a stable family structure, permanent family roots and outpatient treatment, if necessary, whereas the continuation of the status quo revealed not only a lack of substantial recovery, but an actual regression touching directly upon the best interest and welfare of their son.

It is apparent from the record that both parties are entirely fit and proper persons to have custody of their son, but that "[t]he guiding star is and must be, at all times, the best interest of the child." Nye, supra, at page 415.

Although the trial court also made a finding that defendant had remarried and the child expressed a preference to reside with defendant, the court did not order the change of custody solely upon those circumstances.

Plaintiff in support of her argument that the remarriage of defendant and preference of the child is insufficient to justify a change of custody, relies upon Hirth

v. Hirth, 59 Ill App2d 240, 207 NE2d 114, 116 (1965) and Stickler v. Stickler, 57 Ill App2d 286, 206 NE2d 720 (1965).

However, in Hirth, supra, the remarriage of defendant in that case was the sole circumstance relied upon to effect and justify a change of custody and the evidence failed to establish that plaintiff had become less fit to have custody or that the welfare of the children required a change.

In Stickler, supra, the court said, page 290:

"We do not mean to say that a child's preference may not properly be a factor to be considered by the court, but we do mean to say that, when custody has once been awarded, it may not properly be changed on that ground alone."

In the case at bar the record amply reflects that the trial court did not find the substantial changes in circumstances effecting the best interests and welfare of the child to have been defendant's remarriage or the child's preference to live with defendant, although the child's preference is a factor which could have been considered by the court.

Plaintiff also contends that the trial court violated the constitutional guarantee of due process of law because the trial court based its findings in part on a private interview with the child.

The record reveals that the court interviewed the child in chambers in the presence of both counsel and no objection was advanced by either party. At the termination of the interview the court took the bench and in open court, prior to commencing the hearing said:

The Court: "Let the record reflect that prior to the commencement of this hearing there has been a conference in chambers with

208

both counsel outside the presence of the respective clients in which the court interviewed the minor child of the parties hereto, namely, Ralph Levy."

In Oakes v. Oakes, 45 Ill App2d 387, 195 NE2d 840 (1964), in a proceeding regarding the change of custody, the parties stipulated that the trial judge interview the child in chambers out of the presence of the parties, their counsel and the court reporter to determine the child's preference. The child was not sworn nor did she testify at the proceedings, but the trial judge, at the conclusion of the proceedings, announced the child's preference.

In the case at bar the child was sworn and testified in open court and expressed his views and feelings at considerable length both on direct and cross-examination.

The court in Oakes said, at page 394:

"The right of the court to exercise a proper discretion with respect to interviewing the child in chambers should be legalized, and it is our conclusion that it was properly done in the instant case. To protect the right to appeal, *the court upon motion should state for the record,* if that becomes necessary, the substantive parts of the child's statement to him." (Emphasis supplied.)

We find no violation of due process resulting from the court's interview with the child.

The following documents were introduced into evidence by plaintiff, properly objected to by defendant, and on appeal plaintiff now contends that court erred because the admission into evidence of these documents violated the hearsay rule:

(1) A letter dated July 10, 1968, addressed to "Whom it may concern" from a social worker

209

at the Home regarding the child's health, prognosis, programs and treatment.

(2) A medical report from a psychiatrist at the Home, mailed to Dr. Maltz, at his request, which report discussed the child's progress, symptoms, treatment and prognosis.

(3) A report card reflecting the child's performance at school.

■ Plaintiff's documentary evidence of which she now complains was placed in evidence by plaintiff to afford her witness, Dr. Maltz, a basis upon which to express his expert opinion. Plaintiff cannot now successfully argue the impropriety of admitting the documents into evidence when she offered them into evidence, and they were received over defendant's proper objections. Zeigler v. Illinois T. and S. Bank, 245 Ill 180, 91 NE 1041 (1910).

Plaintiff also contends that the trial court erred in admitting into evidence, over plaintiff's objection, Defendant's Exhibit No. 1, which was a cover letter and summary addressed to defendant's attorney and dated December 2, 1965. It was a clinical summary conducted by the Community Child Guidance Clinic of Camden, New Jersey of the clinic's contacts with the child, his family, along with diagnostic, prognostic information and the clinic's recommendations in terms of the child's future treatment. It was furnished to defendant's attorney with the written approval of plaintiff with the proviso that copies be furnished her attorney.

It is noted that defendant's Exhibit No. 1 was dated December 2, 1965, and the decree of divorce and the awarding of the child's custody to plaintiff was entered March 8, 1966.

■ The record does not reflect that the trial court relied upon any portion of defendant's Exhibit No. 1 in the determination of any of the issues in this mat-

ter or considered any evidence prior to the date of the decree of divorce. This was a trial without a jury and there is also presumption that the trial court considered only competent evidence. Cf. Pippert v. Schiele, 315 Ill App 563, 566, 43 NE2d 407 (1942).

We therefore find that the trial court properly changed the custody of the child from plaintiff to defendant and that this order was predicated upon evidence of a substantial change of circumstances that directly affected the best interest and welfare of the child. We therefore, affirm the order of the trial court of July 26, 1968.

Judgment affirmed.

DRUCKER, P. J. and LEIGHTON, J., concur.